Case number 19-1155, United States Postal Service Petitioner v. Postal Regulatory Commission. Mr. Boardman for the petitioner, Mr. Pham for the respondent. Good morning. Mr. Boardman, would you like to proceed? Thank you, Your Honor, and good morning to yourself. I represent the Postal Service, and we ask that the Court vacate and remand the Commission's decision in this case. The case, of course, concerns the disclosure of confidential Postal Service data with respect to the volume, revenue, cost, and contribution of mail matter coming into this country from abroad. That is to say, letters, flats, which are large-sized letters like magazines, bulky letters, and packets. In determining whether to make this information available to the public without protective conditions, the Commission weighs the injury to the Postal Service as opposed to the public interest in the disclosure. In this case, the Commission unreasonably determined that the Postal Service would have virtually no injury and unreasonably determined that the public interest in having this information, again, without protective conditions, was vital. Ms. Boardman, this is Jedra. So, just based on what you just said now that it was unreasonable, I was wondering if you could just help me understand your Chevron argument. In the opening brief, I was wondering if you were suggesting that 504-G3 unambiguously permits only a certain type of competitive abuse, and so, therefore, the Commission's interpretation fails at Step 1, or are you suggesting instead that it fails at Chevron Step 2? And I guess, you know, do we need to use the Chevron framework here at all? You don't have to use the Chevron framework. The APA framework works as well. We are not suggesting that the balancing test is a Chevron Step 1 case. We are saying that the Commission's determination of both determinations is unreasonable under those tests. Turning to injury, if this data is disclosed publicly, even in aggregated form by country group, the Postal Service will lose volume, it will lose revenue, and its contribution will decline. Now, the Commission noted that the private companies don't disclose information at the product level like this, and they conclude that that is beside the point. It's not at all beside the point. In fact, it's axiomatic that companies don't disclose data of this kind because it will adversely impact their bottom line. And the same is true here. If this is disclosed, our contribution will decline. Mr. Boardman, this is Judge Griffith. I understood your argument to be that the public interest here is limited to public interest in government abuse. Where did that limitation come from? That's not – That's not the language of the statute, but where did that come from? Your Honor, that's not quite our argument. What we're saying is that the key phrase, vis-à-vis public interest, is the government established competing in a commercial marketplace. And that key phrase was not defined in the Commission's decision. It wasn't even addressed in that context. We gave one illustration vis-à-vis government abuse that you raised as to how that might be defined. But our point is that until the public interest or the scope of the public interest is defined, we cannot determine whether the public interest is important in this case or not. Indeed, the Commission's determination that it's vital is wrong, unreasonably wrong, because at this point, the basic underlying problem with these products being financially underwater has been fixed. The problem was that the Postal Service could not price the products in a way that would make a contribution, make a margin, make a little profit. Surely you would acknowledge that the public has an interest in a mail product that's losing millions of dollars a year, right? There's a strong public interest in that, particularly when the government is undertaking a reform agenda to try and fix that problem, right? The public is interested in it, and our point is that for 20 years it was underwater. Why disclose the information now without protective conditions? At this point, these products have been moved. Good government at work. I mean, I don't know. We don't get into policy arguments here. But we're to give the Commission a great amount of deference in determining what public interest is here. You agree with that, right? I do agree that the Commission is entitled to reasonable deference, but I also contend that this is not reasonable. There is no vital interest in this information at this time except under protective conditions so that our competitors can't use it to undermine our successful markets, our markets where we have a contribution. The statute doesn't say vital interest. It says a public interest. The Commission determined that the public interest here was vital. That's why I'm using that phrase. We are saying that the public interest is not substantial compared to the large injury to the Postal Service. The Commission determined that there was almost no injury, and therefore that side of the balance was de minimis. But on the other side, the public interest was great or vital, as I've used, and therefore it dominates. And I'm saying both of those conclusions are unreasonable. It's unreasonable with respect to public interest because not only is the scope of that interest undefined, it is unreasonable because the underlying problem whereby the Postal Service could not set prices has been fixed. We have now set prices. Those prices have gone up. We don't need to have this information released so that our competitors on an unlevel playing field can use this to remove our most successful markets from us so that our competitors won't be able to price their similar products in a way that we will lose market share and that we will lose contribution. I'm going to refer, in some of my remarks, to the sealed appendix, but I will do so somewhat elliptically. I have a few points to that, Council. I wonder if you would just help me here. You say the problem is fixed. The Service has fixed prices, and now, of course, come July 1 of this year. The Commission knows all this, and yet it nevertheless found or concluded that public disclosure was vital. Now, other than arguing that this makes no sense, I mean, a really extreme argument, and you're not making that, what was the Commission really focused on then? The Commission was focused upon solving the problem that these products had been underwater for some 20 years. The Commission moved the small packet, for example, from the market-dominant side of the equation to the competitive equation, and following the presidential memorandum, the Postal Service has the ability to set its own prices at a higher level so that the problem can be fixed. The Commission wanted to improve the negative contribution. Unfortunately, its order to disclose the information cuts against its very goal. I won't say well-nigh impossible, but it will certainly make it far more difficult for the Postal Service to solve the problem if this information is disclosed without protective conditions, because our competitors, as well as foreign posts, will be able to use that information against us in setting their price levels to take away our most valuable product markets and, what I would loosely say, profits. So the Commission responds by saying, we don't think that's going to happen to the extent the Postal Service suggests, and it gives some explanations about aggregate data and what can be found, and in your reply brief, you say the Commission is just wrong. Yes, go ahead. The Commission determined that because there was a high level of aggregation, there would be no damage. For example, and this is a hypothetical figure I won't use to seal appendix, suppose that we have a product that has a 15% positive contribution. That can be modeled by our competitors and set their own prices, and of course, that's an average. Some countries might be 17%, some might be 16%, the average being 15%, some might be 14% and 13%. Competitors will model that and use their prices and come in somewhat lower than 15% and take away our most lucrative markets from us, and we won't have the same ability to respond to them because we won't know their costs, we won't know their margins. And as the dissent points out, the high level of generality with respect to aggregation doesn't really address the cost data by country and shape, which allows accurate modeling of e-commerce packets for large markets. That is a key point for the Postal Service in correcting the problem. Disclosure of that data, however, undercuts our ability to do that. Mr. Wolber, I mean, isn't it a problem? I mean, it seems the Postal Service is, you know, talking about its competitive disadvantage if this information comes out. But I think one of the concerns is that the Postal Service has been, you know, running a negative contribution for 20 years, which is something a private business couldn't do. That would be a loss. So the only reason the Postal Service is able to continue to have rates that don't meet the cost is because it is a government entity that can cross-subsidize with other products and, you know, effectively, like, redistribute across, you know, government expenses. I mean, isn't that part of the problem? And isn't that part of why the statute talks about overseeing this in the public interest? Well, the first thing I can distinguish between the commission overseeing it and the commission releasing unprotected data, the information could be released in a protective way so that the public would be able to comment upon its views about this. I also note that the Postal Service certainly doesn't like the idea of negative contribution historically. It simply did not have the ability to correct it because the UPU set prices, not the Postal Service. Now that we can set prices ourselves, we're going to be in a position that we can correct this. And though the public interest does have an interest in that, it's far less significant than it would have been under the old regime. Now, I won't say that it's marginal, but it doesn't weigh very heavily on that side of the scale compared to the significant level of injury that would be anticipated and would occur were this data released. So help me out. This is close to arguing the commission wants the Postal Service to fail. I don't think they want us to fail. They're very responsible people, and they do the best job. But in this instance, they've made an unreasonable determination, and that's why we think the case should be sent back to the commission for reexamination. Now, I will note also that the commission's rationale for the absence of harm are not just wrong, they're unreasonable. I've already discussed the high level of generalization with respect to aggregation, but they also say that the new regime will mean that the harm is virtually nil. That is almost exactly backwards. The new regime will mean that the Postal Service can set prices, but that the disclosure of this data will undermine our ability to compete. Our competitors in the Foreign Post will have this data, but we won't have theirs. They can set their prices in such a way to remove our most lucrative markets. The majority also said that there's no harm to the Postal Service because the data is stale or outdated. That is not accurate in any sense of the imagination, and it's unreasonable to say it's not stale when it represents data from the most recent fiscal year. It establishes the trends and it conflicts with the commission's general rule and historical rule to keep this kind of data under seal for a decade. Anything further from my colleagues? Not at this point. Thank you, Your Honor. All right. Thank you. So let us hear from counsel for respondent, Mr. Phan. May it please the Court, good morning. Dennis Phan from the Department of Justice for the Postal Regulatory Commission. Where there's a difference here in this case I think between the Postal Service and the Postal Regulatory Commission is the Postal Service's belief that the commission and the public have no real role in all of this. And what I mean is the commission each year evaluates the financial performance of postal service products to assess the Postal Service's financial stability and whether each product is covering its costs. In this particular case, the commission already publishes aggregated revenue, volume, cost, and contribution data for each year. So what it saw was a need to examine that financial information by country group and by shape to figure out why the Postal Service had been losing tens of millions of dollars annually for two decades. And so the commission put together a compliance analysis of that data, and that compliance analysis revealed the drivers of inbound letter posts' poor performance, which had negative market effects. And then based on those and the strong public interest, it reasonably decided that that public interest outweighed any commercial harms. And that's a completely reasonable determination that the commission made. I do want to kind of circle back to the public interest to kind of talk about it with a little bit more particularity, and I think Judge Rao was asking about this as well. You can't really divorce this data from the context in which it's being disclosed. The commission here is providing an annual report, and the annual report is 100 pages long. It analyzes compliance of products. It considers harms to the public from noncompliance, and it makes recommendations for future Postal Service regulatory actions or future commission regulatory actions. And those regulatory actions are all on the public docket. So, for example, you know, if you go to J392 to 393, they give some recommendations about what to do with inbound letter posts. And so what the commission was doing here, it was saying, well, we need a little bit more information about that. And what this particular data does, the country group and shape data, is it identifies trends specific to particular shapes and particular country groups about what is causing the negative performance. And all of that is in furtherance of this compliance mission. It's in furtherance of the mission. It's not to harm the Postal Service, but it's in furtherance of the mission for the public, for the commission, to figure out how to actually get this product fixed and, you know, fixed correctly. And if it doesn't get fixed, you know, I do want to specify that there are some really tangible harms. The commission identified at least three, and I don't think it's accurate to say that the commission never interpreted the statute or never interpreted what it meant for a government establishment to be competing in commercial markets. The commission walked through several ways in which the Postal Service's role in the commercial markets and the way that it competes in the commercial markets is causing harms in those markets and causing harms to the public. And so there's at least three. I think the commission first identified a broader interest about this negative contribution, these losses over two decades, threatening the financial integrity of the Postal Service itself. We're not talking about a million dollars here or a million dollars there. We're talking about numbers that hover around nine figures every single year. The second link to the public interest is that there's an interest in not shifting costs to U.S. customers. And you can find this on JA650 where the commission talks about it, and they call it discriminatory treatment. And what that basically means is that domestic mailers right now are paying an unfair burden for the same – sorry, Your Honor. So domestic mailers now are subsidizing foreign mailers. They're using the same postal infrastructure, but if foreign mailers aren't paying their fair share, it means that the domestic mailers, the U.S. customers, are the ones who are bearing the cost. The third – Counsel, how has the completed UPU reforms impacted the commission's order? Is it part of the problem solved now? So I have a few answers to that. First, you know, obviously we would consider the commission's order at the time that it was issued. The second answer I have is the commission considered the possibility of UPU reforms, and it's stated quite reasonably that the potential reforms only heightened the public interest in this arena. And I don't think, you know, the Postal Service should be able to take advantage of the delay in litigation to then say, well, the commission's order post hoc is unreasonable. And so I do want to spell out a couple of ways in which there is still an ongoing interest. I mean, the UPU reforms, just to break this down, they only cover – there are three groups of mail, and this is a little bit specific, but, you know, there's the small letters, large letters, and then the small packets and bulky letters. They only cover one of those categories of mail. And they only cover that category of mail, the small packets and bulky letters, as to some of the larger countries. And so they don't cover them as to every single country across the world. And so in reality, what we have is sort of a hybrid system where there's self-declared rates for some things and terminal dues for other things. And even where there are self-declared rates, you can see on pages eight to nine of our brief, we discussed this. The commission still has a role in approving those. The commission can say, no, no, no, those self-declared rates wouldn't cover your attributable costs. And that's a public docket function that the commission has that the public needs to be able to comment on, to participate on, to try to fix the problem. And even where there are these sort of terminal due rates remaining as to other products, the commission also prepares recommendations regarding those products. And those are, again, public recommendations. There's no, and this is all part of the commission's own public function. So in that sense, I don't, I don't think it fixes the problem at all. And I think it only decreases their commercial harms or their claims to And I heard opposing counsel mentioned how a commission discussed that the data might be stale. What the commission was saying was that we're now that we're entering a new system where perhaps the postal service has new ways to make money or new ways to price their products. Of course the old data is not going to reflect exactly the type of financial market that the new system is under. And so in that sense, the public interest is still there. And the commission found that the public interest was only heightened based on these four reforms. And the commission also thought that those reforms made it so that the commercial harms were far less. I do want to, I do want to mention that the third type of harm here, because I do think the strength of the commerce, the strength of the public interest is much of what the commission was balancing here and why the balance was reasonable. The third type of harm might not be totally clear and the postal service doesn't directly address it, but it's about distortions in the trade flow or distorting competition. And what that means is that because of the artificially low prices for in bound letter posts, and also when there's artificially cheap international shipping, that harms domestic shipping and domestic manufacturing. So for example, if shipping something from Angola to California costs something similar to shipping from New York to California and building a factory in Angola is going to be far cheaper than building a factory in New York, companies are going to go build factories in Angola. And that's a harm to the public that the commission is still trying to address that the commission every single year tries to address. And that is part of the strong public interest here. I want to, unless there are questions about the public interest, I do want to mention a few things about the commercial harm. I think at a high level of generality, what the commission found was that the commercial harms were rested on a series of assumptions about what businesses would do or what foreign postal operators, what foreign countries were doing and what the postal regulatory commission said was none of those assumptions really hold water. The postal service has a statutory obligation and a regulatory obligation to, to describe with particularity, the reasons for confidentiality, it bears the burden of persuasion here. And the commission said that, well, you haven't come with the type of proof or with the type of specifics that you would need to show that any of these harms would actually come true. And there's two kind of big buckets of harms. One is the harm that other competitors would in fact compete with the postal postal service. And the other bucket of harms is the harm that foreign countries would enter into treaties with the United States. As to the harm from competitors, the postal regulatory commission looked at and said, well, if a competitor is really trying to compete with the postal service, what they would need to do is they would need to figure out what mail routes to be competing on. This data doesn't reveal data about any particular country. It only reveals it about these four broad country groups. It doesn't identify locations or identities of international or domestic customers. It doesn't talk about modes of international or domestic transportation. And there's all sorts of other reasons why the information isn't specific enough. So if somebody were to say, I want to displace the postal services role in communicating and exchanging postage, exchanging letters with, let's say, the Royal Mail in the United Kingdom, they would need to know from where in the United Kingdom to take those customers and what the cost would be. But it doesn't, this data doesn't even talk about the international costs to foreign operators in that sense. And so this data really isn't actionable in that specific way. The other harm that I do briefly want to get to, because opposing counsel did mention it, is the harm to foreign, the harm in negotiations with foreign countries. And I just want to mention on this point, both the dissent and also the postal service itself conceded in the report that this concern doesn't apply at all to volume and revenue data. And in fact, in the postal services reply brief, they don't even make any argument as to volume and revenue data generally, but it's at least the harm in negotiations. There's a couple of assumptions that the postal service just hasn't shown, and it hasn't pointed to anything specific that would give the court assurance that those assumptions are true. It assumes that the United States is going to go off and negotiate and enter into agreements that puts itself in a worse off position. The United States doesn't have to enter into any agreements and the UPU rates, whether the self-declared rates or the terminal rates are the default rates that the United States has. So whenever the United States is going out there in the world and negotiating, it's going out there to put itself in a better position. The second assumption is that even if somebody suggested that the United States be put in a worse position, that the United States couldn't resist negotiating efforts along those lines. I mean, the United States isn't a sort of bit actor in the postal world. It has negotiating power. It has the ability to self-resist efforts and to negotiate with foreign actors. And then the third assumption is that whenever these negotiations happen, they're ones in which inbound letter post is something that features heavily. And that's just not an assumption that's historically held any water and the postal service. You can see NGA 673 to 675 discusses why other sorts of agreements are not the ones in which inbound letter post has specifically been the target. And in fact, usually there these agreements are about all sorts of other types of services in which inbound letter post is just one small segment of. And, and so for those reasons, the commission reasonably found that the commercial harms were slight and it reasonably found that there was a vital public interest. And it certainly did not act outside the bounds of its discretion in balancing those. Unless there are further questions, we would ask that the position be denied. Any further questions. Thank you, Mr. Fan. Counsel for the postal service, Mr. Boardman. Thank you, Your Honor. The postal service does believe the public has a role in this somewhat contrary to the commission's view. We say in this case, however, one, the importance of the public because the problem has been fixed and further to the public interest services competitive position will not be undermined as opposed to disclosing it without those protective conditions. Our point with respect to the government established competing market is that in order to determine what the public interest is, one must first know the scope of that public interest. The commission seems to think it's just a general interest in transparency, yet the language that I just quoted in some way cabins the public interest. And we think the commission was required to address that point. We do share the view that the UPU rate caused discriminatory treatment, that American mailers were at a disadvantage. The problem was we were not in a position to correct that because the UPU prices were set too low. But now with the price raises that have been announced to go into effect in July, that problem, that problem will be, will be solved. The postal department, the commission knows that the post service can still resist this situation when it's competitive competitors to gain access to this information. Certainly we could resist it, but the question is to what extent can we resist it successfully? And that goes back to my point that private companies don't release data of this kind because they know it will have an impact upon their bottom line. And the same thing is going to happen here if our competitors, if foreign operators, I see my time is expiring, if foreign operators gain access to this information. So we asked that the court vacate the decision and remand the matter to the commission. Thank you, your honors. Thank you. We will take the case under advisement.
judges: Rogers, Griffith, Rao